IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROL A GOOS,<br><br>        Plaintiff,<br><br>  v.<br><br>SHELL OIL CO.,<br><br>        Defendant.               / | No. C 07-6130 CRB<br><br>**ORDER GRANTING JUDGMENT AS A MATTER OF LAW** |

      Plaintiff brought this action against Defendant Shell Oil asserting claims for failure to accommodate her disability, failure to participate in the interactive process, gender discrimination, harassment, and retaliation. Compl. ¶¶ 13, 19. Defendant moved for summary judgment on March 20, 2009. See Dkt. #29. This Court granted that motion in part, granting judgment as to all claims relating to Plaintiff's allegations of harassment and retaliation. However, this Court denied the motion as to Plaintiff's claims for failure to accommodate her disability, and for failure to engage in the interactive process.

      Those claims were the subject of a trial that began on April 5, 2010. At the close of Plaintiff's case in chief, Defendant moved under Rule 50 for judgment as a matter of law. Defendant argues that the evidence produced in Plaintiff's case in chief establishes that no reasonable juror could find in favor of Plaintiff, and that Defendant is therefore entitled to judgment as a matter of law. As explained more thoroughly below, this Court agrees. The

1 trial record clearly reflects that Defendant Shell was fully engaged in the interactive process
2 and repeatedly attempted to discern what workplace restrictions Plaintiff was subject to as a
3 result of her disability.  However, for reasons that may well have been reasonable at the time,
4 Plaintiff prevented Defendant from learning the specifics of her disability.  Instead,
5 Plaintiff's treating physician repeatedly certified that she was completely disabled and never
6 specified for Shell any circumstances under which Plaintiff could have returned to work.
7 While Plaintiff now contends that Shell should have offered a different position as an
8 accommodation, the record clearly reflects that Shell had no way of knowing whether or not
9 Plaintiff would have been capable of working in any particular position.  Instead, Shell
10 simply continued to receive medical certifications reflecting the treating doctor's conclusion
11 Plaintiff remained unable to work.  While Plaintiff is correct that California law does not
12 require that she request a particular accommodation in order to be entitled to it, it similarly
13 does not require that Defendant exercise clairvoyant perception in its efforts to accommodate
14 a disabled employee.

15      Because the evidence introduced in Plaintiff's case in chief reflects the fact that, in
16 light of the circumstances, Shell appropriately accommodated Plaintiff, and moreover that
17 Shell appropriately engaged in the interactive process, Shell is entitled to judgment as a
18 matter of law.  Therefore, Defendant's motion must be granted.

19 I.     Plaintiff's Employment History

20      Plaintiff Carol Goos has been employed at Defendant Shell Oil Company's Martinez
21 refinery since 1991. Trial Trans. at 57:11-13.  While working for Shell, Plaintiff earned a
22 bachelor's degree in human development. Id. at 80:12-15.  Plaintiff has been an exemplary
23 employee and has received numerous accolades based on her performance. Id. at 75:25-
24 76:22.

25      During her tenure at Shell, Plaintiff has served in several positions, including as a
26 machinist, planner, rover, seal room attendant, special projects coordinator, and temporary
27 trainer.  Between 2002 and 2005, Plaintiff was transferred back and forth between positions
28 as a machinist, a temporary planner, and a temporary trainer. Id. at 68-69.  Plaintiff sought a

1 permanent planner position but was returned to work as a machinist in January 2006.  Goos
2 Decl. 2 ¶ 10.  A "machinist" operates heavy machinery to transform pieces of metal into
3 other objects.  A "planner" writes estimates and job plans for the servicing of equipment in
4 the refinery.  Id. ¶ 9.

## II.   Plaintiff's Disability

Plaintiff began receiving treatment for depression in 2004.  In 2006, Plaintiff began treatment with psychiatrist Dr. Peter Brandes, who diagnosed Goos with major depression.  Trial Trans. at 84:19-23.  In June 2006, Plaintiff commenced medical disability leave from her position at Shell.  Id. at 87:12-17.  In order for Plaintiff to take advantage of this leave, Dr. Brandes submitted a Medical Certification for Non-Occupational Injury or Illness.  Trial Ex. 9.  This certification listed "major depression" as the diagnosis, and Dr. Brandes remarked that "Patient has become too depressed to work at all at this time."  Id.  The certification listed the recommended "return to work date" as August 1, 2006.  Id.  Dr. Brandes continued to submit new certifications nearly every month.  The final certification listed November 20, 2007, as Plaintiff's return to work date.

For the first thirteen weeks of Plaintiff's disability leave, Shell continued to pay her as if she had continued to work.  Trial Trans. at 95:12.  For the next 39 weeks, Plaintiff was paid the equivalent of 50% of her regular wages for that period.  Id. at 14.  Next, after Plaintiff had been on disability leave for a full year, she was placed on an extended leave of absence without pay for a maximum of two years.  Trial Ex. 18.

### A.   Communication with Shell

Starting in October 2006, Jon Sharp acted as Plaintiff's Disability Case Manager.  Sharp testified that he had a conversation with Plaintiff in early October in which he arranged to have Plaintiff examined by Dr. Sorensen, an in-house physician with Shell.  Trial Trans. 379:20-25.  Plaintiff was examined by Dr. Sorensen on October 23rd, who informed Sharp that he believed Plaintiff "could return to work in some capacity."  Id. at 382:2-3.  During this consultation, Dr. Sorensen asked for permission to speak with Dr. Brandes regarding

3

Plaintiff's disability. "Ms. Goos unequivocally denied Shell Oil and Dr. Sorens[e]n permission." Trial Ex. 128, at 5.

After receiving Sorensen's diagnosis, Sharp then attempted to set up a "doctor to doctor" conversation between Drs. Sorensen and Brandes. Sharp testified that he wanted such a conversation to take place because "Dr. Brandes has been saying he doesn't believe Ms. Goos was able to work in any capacity, and Dr. Sorensen had a different opinion, thought she might be able to work in some capacity. And a common thing we do at that point, if there's a disagreement, is just get the two doctors on the phone, let them see if they can come to a meeting of the minds, or if they could agree on something." Trial Trans. at 382:14-20.

Sharp further testified that "there were a few stumbling blocks along the way" to the doctor to doctor conversation. Id. at 384:23. Sharp had requested that Plaintiff release her medical records so that Dr. Sorensen could discuss them with Dr. Brandes, but Plaintiff expressed some reservations. While she refused at first to do so, she agreed in November of 2006 to a limited release of records. According to Sharp, she "requested that her doctor not share with Shell the treatment issues, in other words, that were, quote driving her depression." Id. at 385:2-4. Plaintiff ultimately signed a release of medical information, but handwrote on the release that she did "not authorize discussion on the personal specifics relating to the underlying causes of my condition. I have notified Dr. Brandes of these conditions." Trial Ex. 55. After the doctor to doctor conversation took place, Dr. Sorensen sent the following e-mail:

> Dr. Brandes and I spoke today. The essence of the issue is that Carol's diagnoses preclude her from returning to work until resolved, in the opinion of both her and her physician. She has specifically asked that he not divulge to me the actual cause, in her opinion, for her illnesses. He feels that she is keenly aware of the need to file Med Cert forms monthly, and is aware of her ability to contact Medical and Human Resources with any relevant questions. Sharon and I discussed the call, and feel that management and HR need to determine the relative value of a third medical opinion. If the independent physician determined that she was indeed able to medically return to work, with ongoing treatment if needed, she could then be compelled to do so.

Trial Ex. 6.

//

4

After the doctor-to-doctor call took place, Sharp sent a fax to Dr. Brandes. The fax stated: "Please accept this note as a request to release Ms. Goos to work with appropriate restrictions, per your opinion. If you are unable to do so at this time, please respond via brief note with an estimate of when she may be expected to return to either full or a transitional duty." Trial Ex. 12. Sharp testified that he never received any list of restrictions or any release to work from Dr. Brandes.

B.  Dr. Fenner's Independent Medical Examination

In January 2007, Dr. Brandes extended Plaintiff's leave until March 15, 2007. Trial Ex. 9. At this point, Sharp decided it would be worthwhile to obtain the opinion of an independent medical examiner. See id.; Trial Trans. at 392-93. Shell subsequently arranged for Plaintiff to be evaluated by Carol Fenner, Ph.D, and an examination took place on March 6, 2007. Trial Ex. 1. Sharp received and reviewed Fenner's report on April 2, 2007. Sharp then sent an e-mail to others in his department to inform them that Dr. Fenner agreed with Dr. Brandes that Plaintiff was disabled from working as a machinist due to her medical condition. Trial Ex. 5. Sharp also indicated that both Plaintiff and Dr. Fenner believed that Plaintiff could potentially return to work earlier as a planner, but Sharp further wrote that he believed this option had already been eliminated as a possibility. Id. Ultimately, Sharp concluded that Dr. Fenner's "conclusion is appropriate and should bear the weight of medical evidence on the case." Id. However, Sharp noted that he had received a new Medical Certification from Dr. Brandes that extended Plaintiff's off-work status to May 24, 2007. Id.

Because of its centrality to Plaintiff's claims, Dr. Fenner's independent medical examination ("IME") report–in particular the Discussion & Conclusions section–must be recounted in some detail. That section lists three issues that Shell had specifically asked Dr. Fenner to address. First, Dr. Fenner was asked to complete a psychological testing regimen "to evaluate for malingering." Trial Ex. 1, at 7. Dr. Fenner concluded that she had no reason to suspect malingering. Id. Second, Dr. Fenner was asked "to determine if the employee is disabled from work as a machinist." Id. Dr. Fenner concluded that "at the present time, on a psychiatric basis, she is still unable to return as a machinist." Id. Third, Dr. Fenner was

5

asked whether Plaintiff "may not be working due to a preference or strong desire to enter a different vocation or job assignment." Id. at 8.  While Dr. Fenner concluded that Plaintiff was not motivated solely by a desire to have a different job, she did note that Plaintiff may be interested in a different position, such as a planner position.  When Dr. Fenner told Plaintiff that she was thinking of recommending such a reassignment, Plaintiff's "response was matter of fact, she appeared neither pleased nor displeased, nor did she ask for anything." Id.  She simply responded, "Well, I guess I'll wait to hear from Shell." Id.  Fourth, Dr. Fenner was asked whether the claimant could return to work with restrictions or accommodations.  Dr. Fenner's first response was to say that "[w]hether or not Ms. Goos can return to work at this time is really a question for Dr. Brandes and Cynthia O'Neal, MFCC, who are her treaters and thus best able to make this determination." Id.  Dr. Fenner went on to note that she "would . . . offer a very cautious yes to this question with the restriction that the return be accomplished in such a way that would be restorative to her morale at this point in time." Id. Fenner admits that she never reviewed any job descriptions for either position and based her suggestions on what Plaintiff told her during the examination.  Fenner Depo. 62:7-63:33.

At trial Dr. Fenner testified that, on the question of whether Plaintiff could return to work with restrictions or accommodations, she "punted that question to her treating physician."  Trial Trans. at 329.  She explains that she "had only spent two-and-a-half to three hours with [Plaintiff], and I . . . didn't feel that it was within my auspices to say whether or not she was ready to go back to work in any capacity. . . .  I really didn't think I could accurately answer it." Id.  Dr. Fenner further testified on cross examination that, at the time of her interview with Plaintiff, Dr. Fenner was not aware of the requirements for applicants for human resources positions at Shell, nor was she aware of the requirements for a permanent planner position.  Id at 338.  She also explained that it was her impression that a permanent planner position was a promotion.  Id. at 339-40.

C.   Commencement of Litigation

On June 28, 2007, before receiving a copy of the IME, Plaintiff, through her legal counsel, sent a demand letter to Shell.  Trial Ex. 129.  At that time, Plaintiff argued that she

6

was the victim of gender discrimination and wrongful disclosure of private information. Id. at 2. Plaintiff complained that she was treated unfairly when Shell demoted her back to a machinist position after she served as a temporary planner. Id. at 3. Plaintiff also stated that her foreman, Charles Owen, harassed and discriminated against her on account of her gender. Id. at 4-5. The letter mentioned Plaintiff's depression as a side effect of Defendant's conduct, but Plaintiff's disability was not the focal point of her claims. Id. at 5. The letter insinuated that Shell was improperly pressuring Plaintiff to return to work, despite the fact that Plaintiff's own psychiatrist "has not released Ms. Goos to return to work" and that she had not expressed "a desire to return to work." Id. Counsel stated that "Shell Oil's actions appear to be the basis of a potential adverse employment decision, specifically, a premature release to return to work." Id. After receiving the letter, Shell made no more efforts to contact Plaintiff.

In July 2007, Plaintiff filed a complaint with the Department of Fair Employment and Housing. The Department issued a right-to-sue letter one day later.

Also in July 2007, Jon Sharp sent a copy of Dr. Fenner's IME to Plaintiff's insurance carrier and Dr. Brandes. After receiving the IME, Dr. Brandes shared the report with Plaintiff. Trial Trans. at 557. Dr. Brandes testified that, even after showing the IME to Plaintiff and discussing it with her, they did not discuss in any detail the possibility of Plaintiff returning to work in a non-machinist position, such as a planner or human resources employee. Id. at 559-60. Dr. Brandes also testified that Plaintiff did not express a desire to return to these positions, but that she was apparently not entirely opposed to the idea. Id. at 560. Dr. Brandes never communicated to Shell that he believed that Plaintiff could return to work in any other non-machinist position, nor did he ever tell Plaintiff that he believed she would be able to do these other jobs. Id. at 561. However, he did testify that, given certain assumptions, Plaintiff might have been able to perform a human resources job. Id. at 567. This impression was never communicated to Shell.

At some point after receiving the IME, Plaintiff's theory of the case changed. Whereas in July 2007 Plaintiff's administrative complaint charged Shell with gender

7

discrimination and harassment, the complaint filed on October 22, 2007 asserted claims for (1) "Discrimination Based on Disability, Harassment, Failure to Accommodate Disability, and Failure to Prevent Discrimination" in violation of California Government Code § 12940; and (2) "Retaliation for taking Medical Leave" in violation of § 12945.2. Plaintiff's complaint is based in large part on the information contained in Dr. Fenner's IME and Shell's alleged abrogation of its duties in not following up on Dr. Fenner's recommendations. See Compl. ¶¶ 10-11.

The parties moved for summary judgment in March of 2009. This Court denied Plaintiff's motion and granted Defendant's motion in part. In particular, this Court granted Defendant's motion on the question of Plaintiff's harassment based on disability claim and her retaliation claim. However, the motions were DENIED with respect to the claims for failure to accommodate and the failure to engage in the interactive process.

On April 24, 2009, while the motions were pending, Rachel Peskowitz, a Human Resources employee at Shell, sent Plaintiff a letter with the heading "NOTICE OF EXPIRATION: TWO-YEAR EXTENDED DISABILITY LEAVE OF ABSENCE." Trial Ex. 18. The letter informed Plaintiff that, pursuant to Shell's policy, her employment would be terminated unless she was able to return to work prior to June 24, 2009. The letter then stated: "If you want to discuss returning to work, please contact me as soon as possible. In order to return to work, we would need to have agreement from your attending physician and the Company's physician." Id. On May 18, 2009, Plaintiff e-mailed another Human Resources employee, informing her that she had received Peskowitz's letter, and stating that she wished "to begin the process of a Disability Retirement." Trial Ex. 20. However, she did not express any desire to return to work before June 24, 2009.

On July 31, three months after Peskowitz sent her letter and a month after a number of Plaintiff's legal claims had been dismissed on summary judgment, Plaintiff wrote back to Shell, informing it of her "continued desire to return to work at Shell." Trial Ex. 19. She went on to explain that while she was "currently disabled from working as a machinist because the mediation [sic] I take has side effects which makes it dangerous for me to

8

1 operate machinery. However, I am able and qualified to work for Shell as a planner, trainer 2 or in the Human Resources Department . . . . I request placement in one of these positions 3 which would accommodate my disability." Id. This is the first time Plaintiff ever expressed 4 to Shell an interest to work in a different position. Plaintiff also failed to provide, as the 5 earlier letter had requested, her doctor's opinion that she would be able to do such jobs. In 6 any event, as Plaintiff had been warned in April, her employment had been terminated a 7 month before she wrote her letter.

Trial began in this case on April 5, 2010. Plaintiff rested on April 7, 2010. Defendant then moved under Rule 50 for Judgment as a Matter of Law. This Court informed the parties on April 8 that the motion was granted and that this opinion would follow. See Dkt. #220.

### III.     Legal Standard

"Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000) (quoting Fed. Rule Civ. Proc. 50(a)). "[T]he standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." Id. (internal quotations omitted).

As with summary judgment, a party moving for judgment as a matter of law who does not have the ultimate burden of persuasion at trial (usually the defendant) has the initial burden of producing evidence negating an essential element of the non-moving party's claims *or* showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party has satisfied its initial burden, then the non-moving party must show that there as "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

//

9

IV.     The Law of Accommodation and the Interactive Process

Plaintiff's remaining claims arise under California Government Code § 12940. Section 12940(m) provides that it is unlawful for an employer "to fail to make reasonable accommodation for the known physical or mental disability of an . . . employee." Section 12940(n) provides that it is unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability . . . ."

    A.     Failure to Reasonable Accommodate

Plaintiff contends that under § 12940(m) Defendant should have offered to reassign her to a planner or human resources position as an accommodation of her disability. California regulations establish that:

> Reasonable accommodation may, but does not necessarily, include, nor is it limited to, such measures as:
>
> > (1) Accessibility. Making existing facilities used by employees readily accessible to and usable by individuals with disabilities;
> > (2) Job Restructuring. Job restructuring, <u>reassignment to a vacant position</u>, part-time or modified work schedules, acquisition or modification of equipment or devices, adjustment or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar actions.

2 Cal. Code Regs. § 7293.9(a) (emphasis added). An employee can establish a prima facie claim by proving that (1) she suffers from a disability; (2) she is a qualified individual for a position for which reassignment is sought; and (3) the employer failed to provide a reasonable accommodation for her disability. <u>Jensen v. Wells Fargo Bank</u>, 85 Cal. App. 4th 245, 256 (2000). Plaintiff argues that Defendant never adequately accommodated her disability, and relies primarily on the assertion that Dr. Fenner's report should have put Shell on notice that she was interested in being reassigned to a different position. Plaintiff has repeatedly reminded this Court that "[o]rdinarily, the reasonableness of an accommodation is an issue for the jury." <u>Prilliman v. United Air Lines, Inc.</u>, 53 Cal. App. 4th 935, 954 (1997) (internal quotation marks omitted).

10

However, this is not a straightforward case, and the real question is not whether Defendant offered a reasonable accommodation. Rather, the question is whether a Plaintiff is entitled to her preferred accommodation despite the fact that: (1) she never communicates this preference to her employer, (2) she obstructs her employer's efforts to ascertain the specific nature of her disability, (3) her treating doctor asserts that she is "completely disabled" and never suggests that this disability could be overcome simply by reassigning Plaintiff to a different position, and (4) there was no medical evidence to support the conclusion that Plaintiff's disability would not preclude her from performing other available jobs. Given this context, this Court concludes that Defendant is entitled to judgment as a matter of law.

This Court has previously held, in its order on the motions for summary judgment, that Plaintiff's claim for failure to reasonably accommodate was extinguished as a matter of law when her counsel sent Shell a demand letter in June of 2007. See Dkt. #54 at 14. It is worth noting that this conclusion is further supported by the evidence presented in Plaintiff's case in chief. As noted above, Plaintiff's counsel's letter informed Shell that its effort to return Plaintiff to work could constitute an adverse employment action and could itself subject Defendant to legal liability. This letter nowhere mentioned Plaintiff's interest in continuing to work in an accommodated position. On the contrary, the letter explicitly seeks a severance agreement and informs Shell that Plaintiff has no interest in returning to work. Upon being informed by counsel that any effort to return Plaintiff to work could subject it to a lawsuit, Shell was under no legal obligation to continue its efforts to accommodate Plaintiff's disability.

Plaintiff's counsel attempts to avoid this conclusion by noting that his letter did request that Shell continue to be in touch with him, and that Shell's failure to do so reflected its lack of good faith effort to accommodate her. However, the fact that an employer has an obligation to accommodate disabled employees in no way obligates it to respond to a letter demanding a severance package. An employer is not obligated to settle employment disputes in advance of trial. While this result might be different had Plaintiff's counsel informed

11

1 Shell that Plaintiff wished to be accommodated, he did not do so.  In fact, he did the opposite,
2 informing Shell that she did <u>not</u> wish to return to work.  The letter purported to inform Shell
3 that it had violated various state statutes and that legal action could be avoided only with a
4 cash payment.  Shell apparently determined that Plaintiff's asserted claims were not
5 meritorious–a conclusion born out by the fact that all claims raised in the letter were
6 dismissed at the summary judgment stage–and concluded that it was not in its interest to
7 negotiate.  An employer is entitled to stand on its legal rights.

8 Plaintiff next argues that, whatever the contents of the June 2007 letter, Defendant
9 was put on notice of Plaintiff's interest in an accommodated position when she listed such a
10 claim in her administrative complaint.  <u>See</u> Trial Ex. 23.  And if this was not sufficient,
11 according to Plaintiff, Defendant was once again put on notice when Plaintiff filed her
12 complaint in state court, which asserted that Defendant had failed to reasonably
13 accommodate her disability.  However, given the context, it is impossible to consider either
14 the administrative complaint or the state court complaint as giving Shell notice of her
15 retraction of the June 2007 letter.  That letter stated, in no uncertain terms, that Plaintiff had
16 no interest in returning to work.  Moreover, it asserted that any attempt to return Plaintiff to
17 work would give rise to legal action.  The complaints, however, did not reflect any <u>current</u>
18 interest in returning to work.  On the contrary, the state court complaint merely sought
19 damages for, inter alia, Defendant's past failure to accommodate her.  Plaintiff never
20 requested in those complaints that she be returned to work in any capacity.  It would be
21 entirely unjust to permit Plaintiff to demand that Defendant cease attempting to return her to
22 work, and then to turn around and sue Defendant for complying with her wishes.  Plaintiff
23 cannot have it both ways.  In any event, Defendant's conclusion that Plaintiff was not
24 interested in receiving any accommodations after June 2007 is corroborated by the fact that,
25 when Rachel Peskowitz informed Plaintiff in 2009 that she would be terminated unless she
26 informed Shell of her desire to return to work, Plaintiff expressed an interest in disability
27 retirement, but never in returning to work.  Only in late July, more than a month after her
28 termination, and a few weeks after the majority of her claims were dismissed at summary

12

judgment, did she express an interest in returning to work. Plaintiff cannot be permitted to seek punitive damages from Defendant on the one hand, and then when those claims fail, change course and fault Defendant for failing to reasonably accommodate her in the interim.

As noted in the this Court's prior summary judgment order, assuming that Shell's conduct after the June 2007 is reasonable as a matter of law, this still leaves a window of time before that letter. Plaintiff asserts that, at the very least as to this period, Defendant's failure to offer her reassignment to a vacant position constitutes a failure to accommodate her disability. However, the evidence presented at trial belies this conclusion.

Plaintiff does not contend that she specifically requested that she be reassigned to a different position. Indeed, the evidence at trial would be contrary to such an assertion. Instead, Plaintiff argues that Dr. Fenner's IME report put Shell on notice that, while she was incapable of performing a machinist's job, she would be capable of, and interested in, performing the job of a planner.

To begin with, Plaintiff is correct that California law does not require that in all cases an employee specifically request a certain accommodation in order for an employer to be obligated to provide it. However, there is tension in the case law. Some cases appear to place the burden on the employer to offer an accommodation, while others place a modified burden on the employee, requiring that she inform the employer of what she is and is not capable of doing. An analysis of the cases reflects that this case is more like the latter category, in which Plaintiff bore the burden of keeping her employer informed as to what, specifically, she remained capable of doing. Because the record clearly reflects that Plaintiff failed to do so, and in fact actively obstructed Defendant's attempts to learn the details of her disability, she failed to carry her burden. While Plaintiff certainly was not obligated to share private medical information with her employer, and may indeed have had good reasons not to do so, her employer cannot be faulted now for her decision.

Plaintiff relies in large part on <u>Prilliman v. United Air Lines</u>, 53 Cal. App. 4th 935 (1997). <u>Prilliman</u> was a case where the employees in question never requested reassignment. Nevertheless, the court explained that "an employer who knows of the disability of an

13

employee has an affirmative duty to make known to the employee other suitable job opportunities with the employer and to determine whether the employee is interested in, and qualified for, those positions . . . ." Id. at 950-51. The court rejected the "suggestion that the disabled employee must first come forward and request a specific accommodation before the employer has a duty to investigate such accommodation." Id. at 954. Plaintiff argues that Prilliman is indistinguishable from this case.

An examination of the relevant facts, however, reveals material differences. Prilliman concerned pilots who were disqualified from flying by virtue of the fact that they suffered from AIDS. The FAA at the time prohibited individuals with AIDS from piloting an aircraft, and so when the employer learned that the plaintiffs suffered from the disease, they were grounded. Id. at 941. Instead of offering plaintiffs a different job, the employer simply placed them on disability leave without ever attempting to accommodate their disability. But the facts in this case are different. In Prilliman, the Plaintiffs were prevented from performing their jobs because the FAA forbade individuals with AIDS from flying. Beyond this fact, however, the employer had no reason to believe that, at least as to one of the plaintiffs, he would otherwise be incapable of performing a different job. This case is different. When Plaintiff here first went off work, Dr. Brandes submitted a medical certification indicated that Plaintiff was entirely incapable of working at that time. There was no indication that Plaintiff could do other jobs, nor any reason to believe that an individual suffering from severe depression could do any other jobs. This is unlike Prilliman, where the plaintiffs were prevented from working because of an administrative rule. Those Plaintiffs were never diagnosed by a doctor as being unable to work, and no doctor ever certified to their employer that they were unable to work. In this case, Dr. Brandes did so.

Dr. Brandes was further given the opportunity to inform Shell of the specific nature of Plaintiff's disability, and could have provided a series of restrictions so Shell would have known what Plaintiff remained capable of doing. Therefore, unlike in Prilliman, it is undisputed that the Defendant in this case sought to determine whether Plaintiff could return to work with restrictions. Bianca McCann, a human resource representative at Shell, testified

14

1 that Shell needed to know about Plaintiff's specific abilities, a list of her "cans and can'ts",
2 before one "might look into reassigning to a different position." Trial Trans. at 214. Plaintiff
3 conceded in her testimony that in order for Shell to accommodate her, it had to know what
4 she could and could not do. Id. at 162. She further conceded that she never informed
5 anybody at Shell of what she could and could not do. Id. at 162-63. Instead, the numerous
6 medical certifications spelled out by Dr. Brandes left blank all portions of the form that asked
7 for the specifics of a patient's disability.[1]

Moreover, Plaintiff specifically instructed Dr. Brandes not to disclose what she believed was the cause of her disability–namely, the environment in the machinist shop. Had such information been disclosed, Shell may have been in a position to conclude that reassigning her elsewhere would have accommodated her disability. In the absence of such information, however, it is hard to imagine how Shell could have gone about compiling a list of jobs that Plaintiff could have performed. It simply had no metric by which to determine that a given job would or would not be suitable to somebody with Plaintiff's disability. This is in stark contrast to Prilliman, where the employer knew that the reason plaintiff could not continue in their jobs was only because an administrative requirement.

Dr. Fenner's IME does not change this analysis for a variety of reasons. While the IME does indicate that Dr. Fenner cautiously believed that Plaintiff could have performed a human resources or planner position, it is undisputed that Dr. Fenner did not know what such jobs entailed. Moreover, Dr. Fenner explicitly deferred, or "punted" to use her term, to Dr. Brandes's conclusions regarding Plaintiff's capabilities, as he was the treating physician. Dr. Brandes, even after the IME was given to him, continued to submit medical certification forms reflecting the fact that Plaintiff was disabled. He never communicated in any way to Shell the fact that he agreed with Dr. Fenner's assessment. Shell knew that Dr. Fenner was not aware of the job descriptions for particular jobs at Shell, and knew that Dr. Fenner

---

[1] While Dr. Brandes testified that he understood those forms only to be asking whether Plaintiff could return to the machinist position with certain restrictions, his state of mind is in no way dispositive. It remains undisputed that Shell was never provided a list of Plaintiff's "cans and can'ts" and so was in no position to determine what sort of accommodated position Plaintiff could have performed.

15

deferred in her diagnosis to Dr. Brandes. In any event, almost exactly two months after Jon Sharp reviewed the IME, Plaintiff's counsel wrote the letter in which he specifically demanded that Shell cease trying to bring Plaintiff back to work.

Other California cases support the conclusion that Shell in this context satisfied its legal obligations. In Jensen v. Wells Fargo Bank, 85 Cal. App. 4th 245 (2000), for example, the court noted that "[i]t is an employee's responsibility to understand his or her own physical or mental condition well enough to present the employer at the earliest opportunity with a concise list of restrictions which must be met to accommodate the employee." Id. at 266. It is undisputed that the employee in this case never submitted such a list to Shell, despite the fact that Shell made an effort to acquire such information. Similarly, King v. United Parcel Service, 152 Cal. App. 4th 426 (2007), involved an employee who sued for failure to provide a reasonable accommodation. The plaintiff in that case returned to work after medical leave relating to a blood disorder. He later argued that the terms of his return to work failed to reasonably accommodate his disability. The court granted summary judgment to the employer, noting that the doctor in that case had not informed the employer of any restrictions that limited the plaintiff's ability to work. The court explained that an "employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it." Id. at 443. The trial court noted that the "physician's note did not contain any specific restrictions, and plaintiff never requested nor provided to UPS a doctor's note limiting the number of hours he could work in a day. . . . Nor did plaintiff ever inform his supervisor . . . that he was not able to work the hours he had previously worked." Id. (internal quotations omitted).

King is in a sense the photo-negative of this case. The treating doctor in King, unlike Dr. Brandes in this case, released the plaintiff to work without restrictions. In other words, he indicated to the employer that the plaintiff could do any and all work. Dr. Brandes, however, did not release Plaintiff to do anything. In other words, he indicated to the employer that Plaintiff could do work of any kind. In both cases, though, plaintiffs argue that the employer should have known something beyond what the treating doctor or plaintiff was

1   telling them.  King stands for the proposition that, if a plaintiff wants her employer to
2   consider the specific nature of her disability in crafting an accommodation, the burden rests
3   on the plaintiff to inform the employer of those restrictions.  In this case, then, Plaintiff fails
4   to carry that burden, and instead sues Defendant on the grounds that Defendant was unable to
5   guess at her capabilities, or was otherwise unable to convince her or her doctor to disclose
6   those capabilities.  Again, as noted above, Plaintiff may have had perfectly good reasons to
7   exercise her right of privacy.  However, she cannot now blame Defendant for the foreseeable
8   consequences of her actions.  An employer cannot accommodate an employee's disability if
9   it does not know how that disability affects the employee.  In this case, Defendant
10  accommodated Plaintiff as best it could by placing her on disability leave.  See Dark v. Curry
11  County, 451 F.3d 1078, 1090 (9th Cir. 2006) (explaining that even unpaid leave may be a
12  reasonable accommodation under the ADA).

13          B.      Failure to Engage in the Interactive Process

14          Section 12940(n) of the California Government Code makes it unlawful "[f]or an
15  employer or other entity covered by this part to fail to engage in a timely, good faith,
16  interactive process with the employee or applicant to determine effective reasonable
17  accommodations, if any, in response to a request for reasonable accommodation by an
18  employee or applicant with a known physical or mental disability or known medical
19  condition."  "[T]he interactive process of fashioning an appropriate accommodation lies
20  primarily with the employer," but "[a]n employee cannot demand clairvoyance of his
21  employer."  King, 152 Cal. App. 4th at 443.

22          For reasons similar to those discussed above, this Court concludes that, as a matter of
23  law, Defendant complied with its obligations to engage in the interactive process.  This
24  process is ably recounted in Plaintiff's counsel's June 28, 2007, demand letter.  As explained
25  in that letter, after Plaintiff commenced disability on June 19, 2006, Shell's own doctor. Dr.
26  Sorensen, "consulted with Ms. Goos regarding Ms. Goos' depression.  During the
27  consultation, Dr. Sorenseon asked for permission to speak with Ms. Goos' personal
28  psychiatrist, Dr. Peter Brandes.  Ms. Goos unequivocally denied Shell Oil and Dr. Sorenson

17

permission." Trial Ex. 129, at 5.  Later, Dr. Brandes informed the Plaintiff that Dr. Sorenson had contacted him "regarding his treatment of Ms. Goos.  Dr. Brandes informed Dr. Sorenson that Ms. Goos was unable to return to work in her capacity at that time, <u>but did not otherwise disclose the psychiatric or medical treatment information Dr. Sorenson sought</u>" (emphasis added).  <u>Id.</u>  Next, Dr. Sorenson "contacted Dr. Lisa Hudson, Ms. Goos' primary care physician, regarding Ms. Goos' medical treatment. . . . Dr. Hudson rightly refused to disclose the information to Dr. Sorenson and Shell Oil."  <u>Id.</u>  Next, Jon Sharp "contacted Ms. Goos based upon Dr. Sorenson's recommendation that Ms. Goos could return to work in some capacity.  Such a recommendation directly contradicted the recommendation of Ms. Goos' own psychiatrist, who has not released Ms. Goos to return to work."  <u>Id.</u>  Plaintiff finally agreed to released some medical records, but qualified this release by stating that only "information regarding my treatment, medication, visit verification, and fitness for duty status can be obtained from Dr. Peter Brandes."  <u>Id.</u>  She specifically precluded Shell from discussing "the personal specifics relating to the underlying causes of my condition."  <u>Id.</u> at 6.  Next, Shell arranged for a consultation with an independent medical examiner, Dr. Fenner.  The report was reviewed by Jon Sharp in early April.  Two months later, in early June of 2007, plaintiff's counsel sent a letter clearly indicating that she had no interest whatsoever in returning to work, and that any attempt to force her to do so would constitute an adverse employment action.

      As this chronology reflects, Shell's attempts to engage in the interactive process with Plaintiff were repeated, and were repeatedly rebuffed.  Plaintiff refused to communicate with Shell as it attempted to determine how best to bring her back to work, and Shell was ultimately informed in the June letter that Plaintiff would consider any future attempt to bring her back to work to be actionable in itself.

      Plaintiff's one response to this chronology is to note that, when the letter was written, Plaintiff had not yet seen Dr. Fenner's IME report.  By that time two months had passed since Sharp first reviewed it, and Plaintiff contends that the IME obligated Defendant to re-engage with Plaintiff and offer her an accommodated position as a planner.  Plaintiff has no

18

case law support for such a specific understanding of the duty to engage in the interactive process.  Even if she did, she overstates the nature of the IME.  The IME simply cannot be read as medical evidence that Plaintiff would be capable of working as a planner.  As discussed above, Dr. Fenner clearly deferred to Dr. Brandes, who never released Plaintiff to work in any context at all.  The trial record clearly reflects, and Plaintiff does not really dispute, that Defendant in 2006 was attempting to learn more about nature of Plaintiff's disability.  Plaintiff conceded in her trial testimony that she never communicated such details to Shell.  Given this context, the fact that Dr. Fenner speculated that Plaintiff might be able to perform as a planner–despite knowing nothing of the nature of such work–did not impose a burden on Shell to make such an offer.

Moreover, the significance of the chronology, and the fact that it was written before Plaintiff was given a copy of the IME, was seriously undermined at trial.  Plaintiff relies on this chronology to argue that, had her counsel known of the substance of Dr. Fenner's report, he would have demanded that Plaintiff be accommodated into such a position.  But this is to blink at reality.  Plaintiff was present at the interview and was fully aware of what Dr. Fenner did and did not say.  Had she been interested in returning to work as a planner, and if, as she argues, she had been unaware before the IME that reassignment was even a possibility, her lawyer was perfectly capable of asking for such relief in his June letter.  (He was similarly capable of advising her that reassignment was indeed a possibility.)

Alternatively, she would have been perfectly capable of asking Dr. Brandes to release her to work in such a different position.  Surely her lawyer was aware that such reassignment could qualify as a reasonable accommodation, and must have known whether or not Plaintiff was interested in being reassigned.  When the facts are scrutinized, it is hard to see how the delay in Plaintiff's receipt of the IME could have impacted her lawyer's strategy.  Plaintiff was at the meeting, heard Dr. Fenner's suggestion, and was aware of whether or not she was interested in being reassigned.  If so, so could have told her lawyer, or Dr. Brandes, and could have informed Shell that her position had changed.  Without such initiative, and with Dr. Brandes once again submitting an unqualified disability certification, Shell was under no

obligation to once again make contact with Plaintiff in order to determine if her restrictions have changed.

IV. <u>Conclusion</u>

For the reasons explained above, this Court concludes that Defendant is entitled to judgment as a matter of law on the two remaining claims. Therefore, Defendant's motion is GRANTED.

**IT IS SO ORDERED.**

Dated: April 15, 2010

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE